[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 350 
The plaintiffs, the City of Gulf Shores and the Governmental Utility Services of the City of Gulf Shores (collectively referred to as "Gulf Shores") present 9 issues for our review: whether the trial court erred in (1) instructing the jury on the defense of impossibility; (2) allowing the defendants to present evidence of the City of Gulf Shores's wealth; (3) refusing to admit evidence of inconsistent admissions by defendant Harbert International ("Harbert") from a prior lawsuit arising from the same transaction; (4) excusing a juror for being a citizen of Gulf Shores (Gulf Shores claims this violated § 12-16-3, Ala. Code 1975); (5) submitting the applicability of the parol evidence rule to the jury; (6) admitting large quantities of evidence that allegedly served only to inflame the passion of the jury; (7) refusing to grant the plaintiffs a new trial based on the jury verdict's being against the great weight of the evidence; (8) giving jury instructions regarding assumption of the risk, equitable estoppel, and an engineer's ability to choose between two or more professionally recognized methods or procedures; and (9) refusing to enter a default judgment against defendant A.A. Wickliffe Company ("Wickliffe").
 Facts
This case involves the wastewater treatment system in Gulf Shores, Alabama. A few preliminary explanations are necessary for a full understanding of the case. First, the National Pollutant Discharge Elimination System ("NPDES") is a federal program or plan, administered by the Environmental Protection Agency ("EPA"), that limits or controls the quantity and quality of pollutant discharge that can be dumped into natural bodies of water. Second, the EPA delegates, to a great extent, although not completely, its enforcement authority under the NPDES to qualified state agencies. Alabama's qualified agency is the Alabama Department of Environmental Management ("ADEM"). Third, the NPDES plan calls for the state agencies to issue permits to any municipality, or other pollutant discharger, that wishes to dump *Page 351 
effluent (treated waste) into a stream. In this case, the stream is the Intracoastal Waterway and the municipality is Gulf Shores.
In the 1960s, Gulf Shores built a "lagoon type, aerated" wastewater treatment system. This type of system has several lagoons into which wastewater is funneled and into which oxygen is added to help break down the waste. During the 1970s, Gulf Shores experienced enormous growth as a resort community. As a result of this rapid growth, Gulf Shores quickly outgrew its lagoon type system. ADEM cited Gulf Shores numerous times during the late 1970s and early 1980s for noncompliance with its effluent permit limits (i.e., its effluent levels and quality were not in keeping with allowed limits according to its NPDES permit). In the mid-1980s, Gulf Shores began to seek professional help in dealing with its wastewater management problems.
In May 1984, ADEM issued an administrative order that required Gulf Shores to meet specified interim and final limitations on wastewater effluent levels. Harbert and Engineering Service Associates ("ESA"), as a joint venture called Harbert/ESA, became Gulf Shores's wastewater treatment engineering team. The plan was for Harbert/ESA to plan, design and construct a new, modern wastewater treatment plant that would bring Gulf Shores into compliance with its NPDES permit standards. With the deadline for the interim limitations approaching, Gulf Shores officials asked Harbert/ESA to investigate the use of several filters that were scheduled to be placed into the new plant to lower Gulf Shores's effluent level on a short-term basis. Frank Lindstrom, president of ESA, agreed to, and did, contact several filter companies to see if their filters could be used as an interim measure to meet ADEM's effluent limitations. DynaSand filters made by Parkson Filter Company ("Parkson") were finally chosen. Parkson, Harbert, and ESA all stress in their briefs that the final contracts on this interim package contained provisions stating that Gulf Shores was to provide certain quantities and qualities of influent.[1]
The DynaSand filters were installed as part of the lagoon-type system sometime in June 1985. On August 30, 1985, the EPA imposed a sewer connection and hook-up moratorium on Gulf Shores because of its failure to comply with its NPDES permit effluent limitations and ADEM's administrative order.
Gulf Shores sued Harbert, ESA, Parkson, and Wickliffe, Parkson's sales agent. Harbert was sued for negligence, breach of contract, and breach of warranty; ESA was sued for negligence and fraud; and Parkson was sued for breach of contract, negligence, breach of warranty, and fraud.
The case was submitted to a jury. The jury returned a verdict for all the defendants and against Gulf Shores. The trial court entered a judgment consistent with the jury's verdict and denied Gulf Shores's subsequent motion for a new trial. Gulf Shores appeals.
As stated above, Gulf Shores submits nine issues for appellate review, and asserts that any one issue, standing alone, requires a reversal of the trial court's judgment. We examine each issue in turn, and conclude that the trial court's judgment is due to be affirmed.
 The Impossibility Defense Issue
Gulf Shores argues that Alabama does not recognize the contractual defense of impossibility of performance. Thus, Gulf Shores argues, the trial court clearly erred in instructing the jury on this defense.[2] Parkson argues that Gulf Shores misinterprets the type of impossibility that it seeks to invoke. The type of impossibility that Parkson seeks to invoke is existing impossibility or frustration as stated in § 266, Restatement (Second) of Contracts *Page 352 
(1981). Parkson asserts that this Court has never squarely rejected the use of this doctrine, although Parkson admits that this Court has never endorsed the doctrine either.
We need not determine whether Parkson, in fact, invoked the frustration doctrine, nor whether the frustration doctrine should be adopted by this Court. Although we have repeatedly rejected the impossibility defense, Alabama Power Co. v.Harmon, 483 So.2d 386 (Ala. 1986), Silverman v.Charmac, Inc., 414 So.2d 892 (Ala. 1982), andPoughkeepsie Sav. Bank v. Highland Terrace Apts.,352 So.2d 1108 (Ala. 1977), we conclude that Gulf Shores failed to properly preserve as error the trial court's giving of the impossibility instruction.
Rule 51, Ala.R.Civ.P., states, in pertinent part:
 "No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection."
(Emphasis supplied.)
After the trial court's oral charge to the jury, Gulf Shores objected to the impossibility defense instruction by stating, "We object to the giving of Parkson's requested charges No. 1; No. 8; No. 11; and the one requested by Parkson on the impossibility of performance, No. 5, Parkson No. 5, Judge." (R. at 3554.) This objection failed to state the grounds upon which Gulf Shores objected to the instruction. Crigler v.Salac, 438 So.2d 1375 (Ala. 1983). Thus, Rule 51 precludes Gulf Shores from raising the issue on appeal.
 The Wealth Issue
Gulf Shores argues that testimony regarding how much money it raised through taxes and a bond issue to fund wastewater treatment improvements and/or a new wastewater treatment plant was inadmissible and highly prejudicial because it was evidence of Gulf Shores's wealth. Harbert, ESA, and Parkson argue that Gulf Shores "opened the door" to the admission of this evidence through testimony given by Larry Stejskal, the Government Utilities manager. Harbert, ESA, and Parkson assert that the evidence was proper as cross-examination, impeachment, or follow up, once Gulf Shores opened the door.
The record reveals the following testimony given by Larry Stejskal, the Government Utilities manager, while on direct examination by Gulf Shores's attorney:
 "Q: Can you identify the documents that are in Plaintiffs Exhibit 460?
". . . .
 "A: Yes, sir. This is a document pack related to Change Order Number 1 to the wastewater treatment plant contract.
 "Q: Can you tell from those documents, or your recollection, what the amount of the increase in the cost of the new treatment plant was?
 "A: Forty-eight thousand, one hundred thirty-nine dollars and no cents.
"Q: Did GUSC pay that amount?
"A: Yes, sir.
"Q: To whom was that money paid?
"A: Harbert.
 "Q: What was the reason for Change Order Number 1 to the treatment plant contract?
 "A: Change Order Number 1 was necessitated by additional costs requested by Harbert to reflect what was termed standby time demobilization to remobilization time. I can try to explain what that means, if you like.
"Q: Go ahead.
 "A: After the moratorium was imposed and Gulf Shores was certainly having to take another hard look at all of its options in face of the moratorium being in place —
 [Objection by counsel for Harbert that answer was narrative. Overruled by the Court.]
 "A: I forgot where I was. The need to take another good hard look at all the options that were available to try to recover from the imposition of the moratorium and to ensure that the limited *Page 353 resources of the community would be available to both address the short-term problem of the moratorium and to continue to look at the long-term problem of building the big wastewater treatment facility, we asked Harbert to cease progress on the big plant, the wastewater treatment plant, until we could fully assess those options."
(R. at 1835-37, emphasis supplied.)
Further, on cross-examination by Harbert's attorney, Mr. Stejskal testified:
 "Q: Well, what did you do? Did you order Harbert to stop work?
"A: On December of 20-some-odd of '85, yes, sir.
"Q: Okay. And why did you do that, please, sir?
 "A: As I have testified to earlier, with the imposition of the moratorium and the trauma that certainly imposed on the community, we had to find a way to resolve that issue — resolve that problem, to get the moratorium lifted. There was only a limited amount of resources available in the community. And what we were certainly concerned about is having the capability to both proceed with the large plant contract and simultaneously be able to address the moratorium. And rather than continuing in a headlong direction that was incurring costs daily or further getting us into the big contract with Harbert, and apparently no one had a quick answer of how to solve the problem, we thought it was prudent to control the budget, make sure we knew where the money was going, we had [sic] [did not have?] the money to solve all of our options.
We asked Harbert to stop so we could fully investigate how to recover from the failure of the filter system.
 "Q: How much money did Gulf Shores have in the bank in the fall of 1985 for the purpose of constructing a new plant?
"[By Gulf Shores's counsel] Object, Your Honor.
 "[By Harbert's counsel] Your Honor, the witness testified something about limited resources.
"[By the Court] Overrule the objection.
"A: I don't know."
(R. at 1846-47, emphasis supplied.)
We acknowledge this Court's long-standing rule that evidence of a party's wealth, be it plaintiff's or defendant's, is inadmissible generally. See, Southern Life HealthInsurance Co. v. Whitman, 358 So.2d 1025 (Ala. 1978);Allison v. Acton-Etheridge Coal Co., 289 Ala. 443,268 So.2d 725 (1972); and C. Gamble, McElroy's AlabamaEvidence § 189.05(1) at p. 478 (4th ed. 1991) (hereinafter, Gamble). However, we also recognize that an opposing party may inquire into the other party's wealth on cross-examination or in rebuttal if the other party "opens the door." Record Data Intl, Inc. v. Nichols, 381 So.2d 1
(Ala. 1979); Alabama Power Co. v. Bruce, 209 Ala. 423,96 So. 346 (1923); and Gamble, supra, at § 189.05(2)(c), p. 481.
Here, Stejskal clearly injected the issue of Gulf Shores's financial ability to solve the problem into the case by asserting that Gulf Shores had only a limited amount of money with which to address its wastewater treatment problems. Gulf Shores used its limited resources as the reason for change order number 1, which changed the relationship between Gulf Shores and Harbert, ESA and Parkson. Once the issue was raised by Gulf Shores, Harbert, ESA, and Parkson were entitled to inquire into the matter further to rebut or impeach Gulf Shores's stated reason for the change. We conclude that the trial court did not err in allowing the defendants to inquire into the amount of money Gulf Shores had allocated for its wastewater treatment problems.
 The Prior Pleadings Issue
Gulf Shores argues that the trial court erred in refusing to admit pleadings from a Florida lawsuit filed by Harbert against Parkson. Gulf Shores asserts that in the Florida pleadings Harbert took positions inconsistent with its positions in this case, and, thus, that the pleadings were admissions against interest. Harbert argues that its positions in the Florida lawsuit and in this case were consistent, and also that, even if its positions were inconsistent, *Page 354 
the pleadings were cumulative because Gulf Shores presented Harbert's position to the jury in other ways. Parkson argues that the Florida pleadings establish nothing but Harbert's available defenses, and not its actual position, and concurs with Harbert in asserting that the Florida pleadings were cumulative in this case. We conclude that the admission of the Florida pleadings would have been cumulative, and, therefore, that the trial court did not err in refusing to admit them.
Initially, we note that Gulf Shores is correct that a party's pleadings in a prior case are admissible against that party in a subsequent action as an admission against interest. Yatesv. Christian Benevolent Funeral Homes, 356 So.2d 135 (Ala. 1978), Redwing Carriers, Inc. v. Stone, 293 Ala. 726,310 So.2d 206 (1975). The prior pleadings, however, must be indeed inconsistent with the party's present position and must be "drawn under the party's direction or with his consent."Whaley v. Lawing, 352 So.2d 1090 (Ala. 1977); and see,Murphree v. Henson, 289 Ala. 340, 267 So.2d 414
(1972), and Elder v. Ralls Sanitarium, Inc. 219 Ala. 298,122 So. 41 (1929).
Here, we conclude that Gulf Shores sufficiently established, by other evidence, that Harbert's positions were inconsistent. In the Florida lawsuit Harbert blamed Parkson for the failure of the DynaSand filters and sought damages. In the present action, both Harbert and Parkson assert that the filters failed because Gulf Shores did not meet proper influent levels. Also, it was never seriously contested that the Florida pleadings were drawn under Harbert's direction or with Harbert's consent.
However, this Court will not reverse a trial court's refusal to admit otherwise admissible evidence if the same facts are shown at trial by other means. In short, a trial court's failure to admit cumulative evidence is merely harmless error.Patton v. Palmer, 555 So.2d 127 (Ala. 1989),Sweatman v. Federal Deposit Ins. Corp., 418 So.2d 893
(Ala. 1982), McLemore v. Alabama Power Co., 289 Ala. 643, 270 So.2d 657 (1972).
In this case, the trial court admitted into evidence pleadings from another lawsuit between Harbert and Parkson filed in Jefferson County, Alabama, and concerning the same basic facts as those involved in this case. We think that Harbert's position in the Jefferson County lawsuit was substantially the same as, or at least similar to, its position in the Florida lawsuit.
Further, Gulf Shores questioned Christopher Matthews, Harbert's key employee on the Gulf Shores wastewater treatment project, about Harbert's position against Parkson. The record reads as follows:
 "Q: [By counsel for Gulf Shores] Mr. Matthews, you were still at Harbert in the fall of 1985, were you not?
"A: Yes.
 "Q: And did you review pleading[s] that were filed by Harbert in its lawsuit against Parkson?
 "A: I may have. I can't remember whether I did or not.
 "Q: Yes, sir. I want to show you Plaintiffs' Exhibit 431, which was an answer and affirmative defense that was filed by Harbert International in the lawsuit against Parkson.
". . . .
 "A: I knew there was a filing of some sort. I can't say for sure whether I read this exact document.
 "Q. Yes, sir. Let me ask it another way. Do you recall that in the fall of 1985, it was Harbert's position that Parkson had breached the purchase order?
"A: To the best of my recollection.
 "Q: Do you recall that it was Harbert's position that the filters failed to function in accordance with the contract between Harbert and Parkson?
"A: Yes, I believe so.
 "Q: Do you recall that it was Harbert's position that the filters would not perform as promised and represented and warranted by Parkson?
 "A: I believe so. I think that is part of the Harbert filing."
(R. at 2384-85.)
The Jefferson County pleadings and Matthews's testimony about the Florida pleadings, *Page 355 
we believe, outlined Harbert's position against Parkson. The admission of the Florida pleadings would have been merely cumulative; therefore, the trial court did not err in refusing to admit them into evidence, and if there was error it was harmless. Rule 45, Ala.R.App.P.
 The Juror Disqualification Issue
During voir dire, a venireman, Mr. Larkin, was excused for cause, ostensibly because he was a citizen of Gulf Shores. Gulf Shores argues that striking Mr. Larkin for cause violates §12-16-3, Ala. Code 1975, and therefore requires reversal[3]. We conclude that this was merely harmless error.
Gulf Shores has not shown this Court how Mr. Larkin's being excused for cause "has probably injuriously affected substantial rights of the parties." Rule 45, Ala.R.App.P. Gulf Shores was not denied "a list containing the names of at least 24 competent jurors" nor the opportunity of "alternately striking one from the list until twelve remain, the party demanding the jury commencing." Rule 47(b), Ala.R.Civ.P.; and see, Rosenbush Feed Co. v. Garrison 251 Ala. 245,37 So.2d 106 (1948), and § 12-16-140, Ala. Code 1975. We find no error in regard to this issue.
 The Parol Evidence Issue
Gulf Shores argues that the trial court's instruction on the parol evidence rule left to the jury the issue of whether that rule should apply in this case. While we agree with Gulf Shores that the trial court's instruction left too much discretion with the jury, we conclude that Gulf Shores has not shown this Court that "the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, Ala.R.App.P.
The pertinent portion of the record reads as follows:
 "Parkson, as an affirmative defense to the complaint of Plaintiff, to [Gulf Shores], asserts that [Gulf Shores] and Harbert are precluded from introducing any alleged representations which would vary the explicit terms of the contract between Harbert and Parkson by virtue of the parol evidence rule.
 "The parol evidence rule states that where parties [to] a contract have deliberately put their agreement into writing in such terms as to create a legal obligation without any uncertainty as to the object or extent of the agreement, it is conclusively presumed that all terms that were meant to be [included] in the agreement were in fact included in the final agreement. Therefore, a prior or contemporaneous conversation tending to substitute a new and different contract for the one now in question cannot be considered.
 "If you find that the contract between Parkson and Harbert is a final expression of the parties' intent, you must as a matter of law exclude from your considerations any evidence related to any prior or contemporaneous conversations tending to substitute new and different terms to the contract.
 "If, on the other hand, you find that the contract between Harbert and Parkson is not a final expression of the parties' intent, you may as a matter of law include in your consideration evidence tending to establish the true intent of the parties."
(R. at 3517-18.)
The parol evidence rule is a rule of substantive law that "leaves the question of whether the writing [at issue] is in fact a completed integration to the trial judge to determine as a matter of law." Hibbett Sporting Goods, Inc. v.Biernbaum, 375 So.2d 431, 435 (Ala. 1979). Here, it appears that the trial court asked the jury to make the legal determination for him. Nevertheless, given the circumstances of this case, and the fact that Gulf Shores fails to establish any probable injurious effect as to a substantial right, we refuse to reverse the judgment on this issue. *Page 356 
 The Admission of Evidence Issue
Gulf Shores argues that the trial court reversibly erred by admitting large amounts of allegedly remote and immaterial evidence. The evidence complained of concerned 1) Gulf Shores's compliance or noncompliance with federal and state laws or regulations pertaining to wastewater treatment prior to 1984, 2) the quality of performance of a wastewater treatment plant owned and operated by South Alabama Sewer Service during the period 1985 through 1988, and 3) engineering services performed for Gulf Shores not related to the filtration system at issue.
As to this issue, it is sufficient to note that questions of materiality, relevance, and remoteness of evidence rest within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent a showing of an abuse of discretion. AmSouth Bank, N.A. v. Spigener,505 So.2d 1030, 1041 (Ala. 1986), and see Gamble,supra, § 21.01(6) at p. 38. We find no abuse of discretion here.
 The New Trial Issue
Gulf Shores argues that the trial court erred in failing to grant it a new trial on the basis that the jury verdict was contrary to the great weight of the evidence. Based on our review of the evidence, and on the presumption accompanying a jury verdict, we conclude that no error was committed on this issue.
A strong presumption of correctness attaches to a jury verdict in Alabama, if the verdict passes the "sufficiency test" presented by motions for directed verdict and JNOV.Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990); Alpine Bay Resorts, Inc. v. Wyatt,539 So.2d 160 (Ala. 1988). This presumption of correctness is further strengthened by a trial court's denial of a motion for new trial. Christiansen, 567 So.2d at 1341. Denying, and to a more limited extent granting, a motion for new trial is within the sound discretion of the trial court. See, Jawadv. Granade, 497 So.2d 471, 477 (Ala. 1986). This Court will not reverse a judgment based on a jury verdict on a sufficiency of the evidence basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was "plainly and palpably wrong and unjust."Christiansen, 567 So.2d at 1341. Based on our review of the record, we cannot say that the verdict was plainly and palpably wrong or unjust; therefore, we cannot reverse the judgment on this issue.
 The Allegedly Erroneous Jury Instructions Issue
Gulf Shores argues that the trial court erred in instructing the jury with regard to assumption of the risk, estoppel, and an engineer's making a choice between two or more professionally recognized methods or approaches to a problem. We conclude that Gulf Shores failed to specifically state the grounds upon which its objections were based, and, thus, that Gulf Shores is precluded from arguing this issue on appeal.
As to the assumption of the risk charge, the trial court charged the jury:
 "If you are reasonably satisfied from the evidence that the Plaintiff assumed the risk of having a moratorium imposed, then you cannot return a verdict for the Plaintiff in negligence.
 "The three elements essential to the assumption of a risk in cases of this kind are that the party charged with the assumption of the risk, one, had knowledge of the existence of conditions which could likely have resulted in the imposition of a moratorium and, two, with appreciation of such conditions, three, failed to exercise care for its own best interests by exposing itself to said probability."
(R. at 3507.)
After the oral charge, counsel for Gulf Shores objected to this charge, stating "We object to the reading to the jury ESA charge No. 29, charge No. 30 on assumption of risk; those last two on assumption of risk." (R. at 3553.) This objection did not state the grounds of Gulf Shores's objection, as is required by Rule 51, Ala. R.Civ.P. Crigler v. Salac,438 So.2d 1375 (Ala. 1983). *Page 357 
On the estoppel charge, the trial court instructed the jury as follows:
 "Harbert has raised the defense of equitable estoppel. That defense is based on the ground of public policy and good faith and is used to prevent injustice and to guard against fraud by denying a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and . . . whose conduct they were intended to and did influence. If you determine that the conduct, or acts, or admissions, or representations of either the City of Gulf Shores or the GUSC were relied upon by any party to this action, then you may find that the Plaintiffs are estopped from using their own misconduct to their benefit.
 "There are three basic elements to equitable estoppel: First, a person who has knowledge of the true facts, communicates something in a misleading way, either by words, conduct, or silence; second, the other party relies upon that communication; and third, that the other party would be harmed materially if the person making the misleading communication is later permitted to assert any claim inconsistent with his earlier conduct."
(R. at 3535.)
Counsel for Gulf Shores objected to the estoppel instructions by stating:
 "We also object to the reading to the jury of — and the giving of Harbert's instruction No. 33; Harbert's instruction No. 36; Harbert's instruction No. — numbered 21 through 25, which involve equitable estoppel.
 "We object to the giving of Parkson's charge No. 2 on estoppel."
(R. at 3554.)
This objection, also, failed to state specific grounds as required by Rule 51, Ala.R.Civ.P.
On the choice between different methods or approaches to a problem, the trial court instructed the jury as follows:
 "The duty of an engineer in his profession is to use the degree of knowledge, skill and care ordinarily possessed and used by members of that profession, and to perform any service undertaken as an engineer in a manner that a reasonably prudent engineer would use under the same or similar circumstances.
 "Where there are various recognized methods of procedure, an engineer is at liberty to follow a recognized method of treatment [or problem solving] which he thinks is best, although witnesses may give their opinion that some other method would have been preferable."
(R. at 3506.)
Counsel for Gulf Shores objected to this charge by stating, "Now, we respectfully object to the giving of the Defendant Harbert International's — I beg your pardon, ESA, ESA No. 8, which was read to the jury." (R. at 3553.) This objection most certainly does not meet the requirement of Rule 51, Ala.R.Civ.P.
Therefore, because Gulf Shores failed to state the grounds upon which its objections to these jury instructions were based, it cannot now argue error as to these charges.
 The Default Judgment Issue
Gulf Shores argues that the trial court reversibly erred by refusing to enter a default judgment against A.A. Wickliffe 
Company, an area sales representative of Parkson. Wickliffe participated in discovery and voir dire, but, before trial, the trial court allowed Wickliffe's counsel to withdraw. All parties filed motions for default judgment against Wickliffe, which the trial court neglected to grant or otherwise act upon until after the jury had returned its verdict.
While we do not condone the trial court's neglect of pending motions, we find no reversible error in the trial court's failure to grant Gulf Shores its requested default judgment against Wickliffe. The cases Gulf Shores cites contain language to the effect that a trial court has no choice but to enter a default judgment when requested to do so in a proper case. See, e.g., Roberts v. Wettlin, 431 So.2d 524 (Ala. 1983). However, despite this language to the contrary, it is well settled that an entry of a default judgment under Rule 55(b)(2), Ala.R.Civ.P., is a matter entrusted to the sound *Page 358 
discretion of the trial court. Roberts, at 526; and see, McBride v. McBride, 380 So.2d 886 (Ala.Civ.App. 1980), and Welch v. G.F.C. Credit Corp.,336 So.2d 1346 (Ala.Civ.App. 1976).[4]
Also, a movant is not entitled to a default judgment as a matter of right. Welch, 336 So.2d at 1349. Further, we note that mandamus is the proper vehicle for challenging a trial court's refusal to enter a default judgment, because such a refusal is not a final judgment, which is requisite for an appeal as of right. McBride, 380 So.2d at 888. Additionally, on petition for writ of mandamus, the petitioner must show a clear abuse of discretion to warrant an appellate court's ordering an entry of default judgment.
Based on the foregoing, we affirm the judgment of the trial court based on the jury verdict in favor of Harbert, ESA, and Parkson.
AFFIRMED.
HORNSBY, C.J., and MADDOX,[5] SHORES, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] "Influent" is wastewater that goes into a filtration system; it becomes "effluent" once it is filtered and comes out.
[2] Harbert and ESA do not address the impossibility defense issue. Both assert that the issue is neither relevant nor material to any claim against them.
[3] Section 12-16-3, Ala. Code 1975, reads: "In actions to which the state, a county, a city or a town is a party or has an interest, citizens of the state, county, city or town are not disqualified by reason of interest."
[4] We note specifically that a refusal to enter a default judgment is a discretionary matter. To a great extent, this Court has helped shape the exercise of a trial court's discretion in dealing with motions to set aside
default judgments under Rule 55(c), Ala.R.Civ.P. See,Kirtland v. Fort Morgan Auth. Sewer Serv.,524 So.2d 600 (Ala. 1988), and Fries Correctional Equip. Inc. v.Con-Tech, Inc., 559 So.2d 557 (Ala. 1990). No analysis akin to that in Kirtland has been established for refusals to enter a default judgement.
[5] Justice Maddox was not present at oral argument in this case; however, he has listened to tape recordings of the arguments.